UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**CITY OF BRUNSWICK,** )<br>**GEORGIA** )<br>)<br>Defendant. ) | Civil Action No. 2:24-cv-00144 |

**THE UNITED STATES' BRIEF IN OPPOSITION TO
DEFENDANT CITY OF BRUNSWICK'S MOTION TO DISMISS**

The United States, through its attorneys, submits this opposition to the Motion to Dismiss filed by Defendant City of Brunswick. For all the reasons stated herein, the Court should deny Defendant's Motion to Dismiss (ECF No. 10).

**INTRODUCTION**

The United States filed a lawsuit against the City of Brunswick (the "City" or "Defendant") alleging the City violated the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc5, by unjustifiably attempting to shut down The Well, a resource center for those experiencing homelessness, that is run as an expression of its staff's Christian faith. Over the past two years, the City engaged in a concerted effort to force The Well to close, culminating in a spurious nuisance lawsuit in state court. The City now seeks to avoid reckoning with RLUIPA's religious liberty protections by making unsupported arguments in its Motion to Dismiss. First, as described below, the City's citation to the Anti-Injunction Act falls flat, given the well-settled exception for suits brought by the United States seeking to vindicate its interests—here, the enforcement of RLUIPA. Second, the City's efforts to shut down The Well are within the types of land use regulations that are subject to RLUIPA's

enforcement. Finally, the City's contention that The Well's only burden is to apply for an optional conditional use permit is both arbitrary and at odds with the history of the City's actions toward The Well. Because the United States seeks to advance its interests in the proper interpretation and application of RLUIPA, and because the Complaint plausibly alleges that the City's efforts to shut down The Well—including its nuisance lawsuit—violate RLUIPA, this Court should deny Defendant's Motion.

## FACTUAL BACKGROUND

### The City Seeks to Close The Well

The Well, located at 1101 Gloucester Street in Brunswick, Georgia, has operated as a daytime resource center for those experiencing homelessness since 2014. Compl. ¶ 7 (ECF No. 1). FaithWorks, a religious ministry under the United Methodist Church, runs The Well as an expression of its members' Christian faith. *Id.* ¶¶ 8–9. At The Well, around 60 guests each day benefit from access to showers, laundry, meals, and other services. *Id.* ¶¶ 10–11. In addition, the City has relied on The Well as a warming shelter for Brunswick's unhoused population during severe cold and inclement weather. *Id.* ¶¶ 10–11, 14. Other than in these severe weather conditions, and as sanctioned by the City, The Well has never been open overnight or provided housing to guests. *Id.* ¶ 8.

Before advancing its efforts to close The Well, the City repeatedly cited The Well's services as critical to serving the unhoused of Brunswick, even using The Well to leverage federal housing grants. *Id.* ¶¶ 12–13.[1] But when the local political climate turned against The Well, so did the City.

---

[1] For example, the City's annual report, prepared when seeking $1.15 million from the Department of Housing and Urban Development's Community Development Block Grants in 2022, stated, "The Well serves as a resource and hospitality center to those experiencing

2

In the aftermath of a series of violent attacks across Brunswick, the City—claiming that the incidents were causally connected to The Well—ordered The Well to shut down for at least 65 days. *Id.* ¶ 22. But those incidents bear an attenuated or nonexistent connection to The Well. *Id.* ¶ 44. In fact, even Brunswick's Mayor acknowledged that "several of the instances that we have seen of violence did not happen at The Well." *Id.* ¶ 17. Nevertheless, the Mayor sent The Well a letter on April 11, 2023, requesting that it "immediately close its door [sic] and cease all operations" on account of the "violent attacks on city residents" that the Mayor claimed shared "some discernable connection to [T]he Well." *Id.* ¶ 18.

FaithWorks' Board advised The Well, based on the Mayor's April 11 letter, to temporarily close, effective April 21, 2023, to directly address mounting community concerns with its operations. *Id.* ¶¶ 19–20. At the same time, on April 19, 2023, the City Commission passed Ordinance 1078, titled the Homelessness Services Ordinance, which required Brunswick's homeless services providers to obtain a conditional use permit ("CUP") to operate. *Id.* ¶ 21. That same day, the Commission voted unanimously to order a 65-day closure of The Well. *Id.* ¶ 22. The Mayor sent a letter to FaithWorks informing it of the closure order, without citing an ordinance, regulation, or legal authority underlying the order. *Id.* ¶ 23.

### The Well Closes Temporarily and Implements New Security Measures

Given that The Well predated Ordinance 1078, The Well's staff understood its existing operation on Gloucester St. to be a lawful nonconforming use, and thus exempt from the requirement to obtain a CUP under Ordinance 1078. *Id.* ¶ 24; *see* Brunswick City Code, § 23-3-

---

homelessness during the day," with services such as "showers, laundry, case management, assistance with medications, access to mental health care." Compl. ¶ 12. The City also noted that "The Well receives many individuals just released from jail or prison immediately homeless upon release. . . . Law enforcement agencies and crisis units in neighboring counties continue to provide transportation to the Well without notice." *Id.*

15 (2023) ("Any lawfully existing building, structure or use of land which is not a permitted use in the district within which it is located upon the enactment of this chapter into law shall be deemed to be a nonconforming use."). The City Manager acknowledged that a CUP for The Well's original location would be voluntary. Compl. ¶ 28.

During The Well's temporary closure, its staff developed policies, in coordination with the Brunswick Police Department, to address safety concerns. *Id.* ¶¶ 25–26, 29–31. For example, The Well adopted new policies requiring the Police Department to clear guests of outstanding warrants or sex offender restrictions before guests may enter The Well, prohibiting camping overnight on The Well's porch or the alley adjacent to The Well, and using software to track guests' whereabouts, which enables The Well's staff to exclude any prohibited guests from entering. *Id.* ¶¶ 29–30.

Despite sharing these changes with City officials, the City threatened to use any means necessary to shut down The Well. On June 9, 2023, the City Manager wrote to The Well, demanding that it not reopen its facility at 1101 Gloucester St., but instead seek a CUP under Ordinance 1078 for a different and new location. *Id.* ¶ 28. The Mayor warned that if The Well chose to reopen without renaming itself and firing its religious leader, the City would sue to shut down The Well as a nuisance property. *Id.* ¶¶ 32–33. And the City did exactly that. *Id.* ¶ 39.

### The City Sues to Shut Down The Well

A few weeks after The Well reopened its doors in July 2023 with new security protocols—recommended by the Brunswick Police Department—designed to address the community's concerns, the City filed a lawsuit against The Well's parent organization in Glynn County Superior Court. *Id.* ¶ 39. In its lawsuit, the City alleged that The Well unlawfully operates an overnight shelter in the City's downtown business district without having obtained a

4

CUP to do so. *Id.* ¶ 40; *see also* Compl. ¶¶ 5-11, *City of Brunswick, Ga. v. Southeastern Educational Services, Inc.*, No. CE23-00918 (Glynn Cnty. Sup. Ct. July 21, 2023) (ECF No. 10-1) ("Nuisance Compl."). The City's lawsuit maintained that it "requested [The Well] to voluntarily submit to the newly established homeless shelter conditional use ordinance," but that when The Well "declined . . . and instead asked for meetings with City leadership," the City filed its public nuisance lawsuit. *Id.* ¶¶ 35–36. In sum, the City contended that The Well is a public nuisance and sought a restraining order to preliminarily and permanently enjoin The Well from operating. *Id.* Although privy to The Well's new security protocols, which were also reported in the news, the City made no mention of them in its state court submissions. Compl. ¶ 43; *see generally* Nuisance Compl. FaithWorks' response to the City's complaint rebutted the notion that the violent attacks had any meaningful connection to The Well or were caused by The Well. *Id.* ¶ 44; Answer, *City of Brunswick, Ga. v. Southeastern Educational Services, Inc.*, No. CE23-00918 (Glynn Cnty. Sup. Ct. Aug. 31, 2023) (ECF No. 10-2).

## The Well's New Security Measures Prove Effective

Since The Well's July 2023 reopening, guests have respected The Well's policy against camping on its property or in the adjacent alley. Compl. ¶¶ 20, 29–30, 37. Police calls to or near The Well—which include emergency calls relating to incidents beyond crime—have dropped precipitously. *Id.* ¶ 47; *see also id.* ¶ 48 (detailing a City official's comment that The Well's procedures "have led to a dramatic drop in police calls, loitering, and other complaints"). In fact, the Brunswick Police Chief shared that the "calls have been largely nonviolent and alone do not suggest a larger preponderance of crime." *Id.* ¶ 42. Local law enforcement, hospitals, Salvation Army, and others continue to drop off unhoused guests at The Well to access its many services. *Id.* ¶¶ 11, 49.

At the request of the United States, the City voluntarily stayed its nuisance lawsuit pending resolution of this action.

**LEGAL STANDARD**

The City has moved to dismiss the Complaint under the Anti-Injunction Act and Rule 12(b)(6) of the Federal Rules of Civil Procedure, but fails to meet the standard for a motion to dismiss. In ruling on a 12(b)(6) motion, a court must accept as true the allegations in the complaint and construe the facts in the light most favorable to the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008). Courts have held that to survive a motion to dismiss, the plaintiff's well-pleaded factual allegations "must be enough to raise a right to relief above the speculative level." *Mills*, 511 F.3d at 1303 (quoting *Twombly*, 550 U.S. at 555); *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1037 (11th Cir. 2008). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court also must accept as true a plaintiff's allegations on a motion to dismiss raising abstention arguments. *See, e.g.*, *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 287 n.7 (N.D. Ga. 2003) (citing *Pompey v. Broward Cnty.*, 95 F.3d 1543, 1551 (11th Cir. 1996)).

**ARGUMENT**

**I.      The Anti-Injunction Act Does Not Bar the United States from Vindicating its Interests in Enforcing RLUIPA**

Contrary to Defendant's argument that the Anti-Injunction Act, 28 U.S.C. § 2283, bars this Court from "grant[ing] an injunction to stay proceedings in a State court action," well-settled precedent provides a clear path for the United States' RLUIPA claim in this matter. In *Leiter Minerals, Inc. v. United States*, which the City cites in its Motion, the Supreme Court

6

unequivocally held that the Anti-Injunction Act does not apply where the United States seeks to vindicate its interests in federal court. 352 U.S. 220, 225–26 (1957).

In that case, the petitioner mining company appealed the grant of a preliminary injunction restraining it from pursuing its private state court action over the ownership of mineral rights to certain public lands, among other claims. *Id*. at 221–22. The United States brought a federal claim to enjoin state proceedings and quiet title over mineral rights. *Id*. at 222–23. In affirming the judgments of the courts below and reflecting on the principles of federal-state comity undergirding the Anti-Injunction Act, the Supreme Court held that statutory "interpretation excluding the United States from the coverage of the [Act] seems to us preferable in the context of healthy federal-state relations." *Id.* at 226. The Court continued that concerns of avoiding conflict between federal and state courts are less compelling when

> it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest. The frustration of superior federal interests that would ensue from precluding the Federal Government from obtaining a stay of state court proceedings except under the severe restrictions of [the Anti-Injunction Act] would be so great that we cannot reasonably impute such a purpose to Congress from the general language of 28 U.S.C. § 2283, alone.

*Id.* at 225–26.

Interpretations of the Anti-Injunction Act since *Leiter Minerals* have further confirmed its holding that a claim brought by the United States is a clear exception to the Act's application. *See N. L. R. B. v. Nash-Finch Co.*, 404 U.S. 138, 145–46 (1971) (reaffirming *Leiter Minerals*' holding that the "purpose of § 2283 was to avoid unseemly conflict between the state and the federal courts where the litigants were private persons, not to hamstring the Federal Government and its agencies in the use of federal courts to protect federal rights"); *United States v. Composite State Bd. of Med. Examiners, State of Ga.*, 656 F.2d 131, 134 (5th Cir. 1981) ("The district court correctly determined that the Anti-Injunction Act is inapplicable when the United States is the

7

federal plaintiff."); *see also United States v. Gerace*, No. 21-2419, 2023 WL 3243477, at *2 (2d Cir. May 4, 2023) ("*Leiter* stands for the proposition that the Anti-Injunction Act 'does not bar the United States from seeking a stay of state court proceedings.'" (quoting *Trump v. Vance*, 941 F.3d 631, 638 (2d Cir. 2019), *aff'd and remanded*, 591 U.S. 786 (2020))); *In re Grand Jury Subpoena*, 866 F.3d 231, 233 (5th Cir. 2017) (same); 17A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4222 (3d ed. April 2022 Update) (same). *Leiter Minerals* and its progeny directly refute Defendant's contention that the Anti-Injunction Act bars this Court from adjudicating this matter brought by the United States.

Defendant contends that this well-acknowledged exception does not apply here, because: the private defendant has raised RLUIPA claims in state court; there are no "interests unique to the" United States; the "interests the United States seeks to vindicate" are solely those of a nonparty; and that there is "no risk of 'impairment of its rights'" if this action is dismissed. Mot. at 8. Not so. Defendant ignores the United States' unique role advancing the public interest in this matter, distinct from the individual interest of any private, faith-based organization. *See, e.g.*, *United States v. City of Troy*, 592 F. Supp. 3d 591, 603 (E.D. Mich. 2022) (finding that the United States had standing to assert a RLUIPA claim independent of the standing of the religious group at issue because "[t]he Government also has independent authority to bring an action to enforce compliance with RLUIPA" (citing 42 U.S.C. § 2000cc-2(f))).

Here, the United States bears an interest in both the religious liberty of a private party, FaithWorks, *and* a public interest in the proper application and enforcement of RLUIPA's free exercise protections, given the Attorney General's responsibility to enforce RLUIPA, 42 U.S.C. § 2000cc-2(f). RLUIPA codifies the United States' duty to protect free exercise of religion without the imposition of land use regulations that inflict unjustified substantial burdens on

religious exercise. The ability to vindicate these interests in court is critical to the furtherance of the United States' RLUIPA enforcement program. The United States' interest in ensuring that FaithWorks' religious exercise is not improperly burdened by the City's land use regulations cannot be vindicated in state court, where the United States is not a party to that action. As the *Leiter Minerals* Court held, to deny the United States the ability to vindicate its federal interests in federal court would contravene the purpose of the Anti-Injunction Act. 352 U.S. at 225–26.

Further, allowing the United States to litigate its RLUIPA claim in federal court does not contradict "the overarching principle that federal courts are to be cautious about infringing on the legitimate exercise of state judicial power," Mot. at 6 (quoting *Texas v. United States*, 837 F.2d 184, 186 (5th Cir. 1988), *cert. denied*, 488 U.S. 821 (1988)). Indeed, the Fifth Circuit in *Texas v. United States* acknowledged that "because a federal agency seeks the injunction, the [United States'] motion is not directly precluded by the strictly enforced rule of the Anti–Injunction Act." *Id.* And unlike in *Texas v. United States*, RLUIPA expressly authorizes the United States to seek injunctive relief, "to enforce compliance" with RLUIPA, *see* § 2000cc-2(f), indicating that Congress has indeed "tipped the balance in favor of federal interests." *Texas*, 837 F.2d at 187. The City's citation to *Trump v. Vance*, 941 F.3d 631 (2d Cir. 2019), Mot. at 6, is similarly unavailing. There, the Second Circuit surveyed abstention jurisprudence "in the *Younger* context" and found that "nearly every circuit to address the issue has either held or suggested that abstention is unwarranted" where "the Federal Government seeks to invoke federal jurisdiction."[2] *Id.* at 639 (internal quotations omitted) (collecting cases). The Court declined to dismiss the President's federal lawsuit, which alleged that the state court prosecution of his

---

[2] This includes the decision by the former Fifth Circuit in *Composite State Bd. of Med. Examiners, State of Ga.*, 656 F.2d at 134, which is binding on this Court, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209–10 (11th Cir. 1981) (en banc).

9

private organization violated the presidential immunity doctrine, finding that the President's federal complaint "raises novel and serious claims that are more appropriately adjudicated in federal court." *Id*. Here, the United States is asserting its own interest in ensuring that religious land use is not unlawfully burdened.[3]

Finally, the Court should not credit Defendant's argument that the United States' non-defensive posture in this case is a barrier to federal jurisdiction, *see* Mot. at 8, which runs afoul the breadth of caselaw affirming the principle that federal actors should have access to bring affirmative lawsuits in federal courts. *See N. L. R. B.*, 404 U.S. at 145–46; *Leiter Minerals*, 352 U.S. at 225–26; *Trump*, 941 F.3d at 637–38.

## II. The City's Efforts to Shut Down The Well Are Land Use Regulations Subject to RLUIPA's Enforcement

Defendant contends that this case should be dismissed, asserting that neither its state court nuisance action nor the Complaint in this case hinge on the City's noncompliance with a "land use regulation." This, Defendant suggests, absolves the City of enforcement under RLUIPA. Mot. at 10. The City is incorrect. Its concerted efforts to permanently shut down The Well are squarely within RLUIPA's purview.

RLUIPA applies to the imposition or implementation of a "land use regulation," § 2000cc(a)(1), which is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land)." Wary of local governments' surreptitious efforts to mask the true nature of their land

---

[3] That the United States is a party to this action and that the relevant state court proceeding has been stayed since its inception distinguishes this case from the recent lawsuit brought by Resurrection House Ministries against the City of Brunswick, in which this Court found that the Anti-Injunction Act barred adjudication of plaintiff's federal RLUIPA claim. Order at 7–12, *Resurrection House Ministries, Inc. v. City of Brunswick*, No. 2:23-cv-117 (S.D. Ga. Aug. 23, 2024) (Wood, J.)

use enforcement efforts, courts applying RLUIPA "look[] to the functional application of a law rather than its abstract, formalistic classification when deciding whether it a 'zoning law' for RLUIPA purposes." *United States v. Cnty. of Culpeper, Va.*, 245 F. Supp. 3d 758, 768 (W.D. Va. 2017) (finding that county's "pump and haul" sewage permitting process was a land use regulation for RLUIPA purposes) (citing *Fortress Bible Church v. Feiner*, 694 F.3d 208, 216 (2d Cir. 2012)).

In addition, RLUIPA provides that the general rule against imposing a substantial burden through a land use regulation applies where "a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." § 2000cc(a)(2)(C). The term "land use regulation . . . is used in RLUIPA along with the concept that the government is making an individualized assessment of the proposed use for the property that limits or restricts a claimant's use or development of land." *Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's Cnty., Md.*, No. 19-3367, 2020 WL 585298, at *5 (D. Md. Feb. 6, 2020) (internal quotations omitted); *see also Freedom Baptist Church of Delaware Cnty. v. Twp. of Middletown*, 204 F. Supp. 2d 857, 868 (E.D. Pa. 2002) ("[Z]oning ordinances must by their nature impose individual assessment regimes. That is to say, land use regulations through zoning codes necessarily involve case-by-case evaluations of the propriety of proposed activity . . . .").

Instead of the mechanical approach urged by the City, courts look holistically at how a local government restricts the use of the land to determine whether the restriction at issue is a "land use regulation" falling under RLUIPA. Accordingly, a city's actions and land use decisions based on the city's own assessment of how a particular property can be used are covered by RLUIPA. *See Martin v. Houston*, 196 F. Supp. 3d 1258, 1263–64 (M.D. Ala. 2016) (finding that

11

city's application of a state law restricting where sex offenders could live, following a warning from the city that plaintiff's "property constituted a public nuisance," met RLUIPA's "land use regulation" requirement).

Here, the City's collective and repeated efforts to shut down The Well are intertwined with the City's zoning regulations:

- The Mayor sent a letter to The Well on April 11, 2023, asking for it to close. Compl. ¶ 18.

- When The Well did not immediately close, on April 19, the City Commission—which includes the Mayor—enacted Ordinance 1078, the homelessness services ordinance, which imposed CUP and other zoning requirements on all providers of services to the unhoused. *Id.* ¶ 21. The purpose of the ordinance was to bring all homelessness services operations under the City's discretionary CUP review and approval process. The City wanted, and perhaps expected, The Well to apply for a CUP under Ordinance 1078.

- That same day, the Commission ordered The Well to close for 65 days. The Well had planned to temporarily close, effective April 21. *Id.* ¶¶ 20, 23.

- While The Well was temporarily closed, the City asked The Well to apply for a CUP under Ordinance 1078. *Id.* ¶¶ 34–36.

- When The Well did not apply for a CUP under this Ordinance—understanding that it was a voluntary request and not a mandatory order—the City threatened to sue The Well if it reopened. *Id.* ¶¶ 32–33.

- The City followed through on its threat and filed a nuisance action mere weeks after The Well reopened, failing to acknowledge the host of new security measures The Well implemented to address security concerns. *Id.* ¶ 39.

The City's repeated instructions and orders to The Well governing the use of its own property are tantamount to enforcement of the City's land use regulations. First, the City requested that The Well cease operating at its Gloucester Street location. That was enforcement of a land use regulation. Second, when the City felt that its closure request might not be honored, it ordered The Well to close—again, enforcement of a land use regulation. Third, it simultaneously enacted Ordinance 1078—a land use regulation—for which it expected The Well

to apply. Finally, when The Well informed the City that it planned to reopen without applying for a CUP, the City used the nuisance action as an alternative to the CUP ordinance. The nuisance action is essentially a "vehicle" to enforce the City's zoning code and land use regulations. *See Fortress Bible Church*, 694 F.3d at 217.

In *Fortress Bible Church*, the court of appeals found that although the state regulatory review process was not by itself a zoning law, "the [defendant] Town's actions during the [state regulatory] review process and its denial of the [plaintiff] Church's proposal constituted an application of its zoning laws sufficient to implicate RLUIPA" in part because "in its Town Code, the Town has intertwined the [state regulatory review] process with its zoning regulations." *Id.*; *see also Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1222 n.9 (C.D. Cal. 2002) (finding that city's eminent domain action against church was a "land use regulation" under RLUIPA because it would "unquestionably limit or restrict [the church's] use or development of land" (cleaned up)).

So too here. While Defendant suggests, *see* Mot. at 10, that the underlying state court complaint does not turn on land use regulations,[4] its own pleadings demonstrate otherwise. The root of the City's nuisance complaint is an (inaccurate) allegation that The Well operates as an overnight shelter, which is an impermissible use under the City's zoning code. *See* Nuisance Compl. ¶¶ 3–8 (alleging The Well is in the "downtown business district, . . . zoned General

---

[4] In support of its argument that its nuisance claim is not covered by RLUIPA, Defendant cites *Temple of 1001 Buddhas v. City of Fremont*, 562 F. Supp. 3d 408 (N.D. Cal. 2021). Mot. at 9. But *Temple of 1001 Buddhas* stands for the unremarkable proposition that building and safety code regulations, like the "California Building Code, California Electrical Code, California Plumbing Code, California Mechanical Code, and California Fire Code" may not be covered by RLUIPA. *Id.* at 430. The City makes no claim that The Well has violated any local building or safety codes and instead admits the opposite—that "it is not necessary that [The Well] should endanger the health of the neighborhood" for the City to prevail on its nuisance claim. Mot. at 9–10 (citation omitted).

Commercial," and therefore cannot operate an overnight shelter); ¶¶ 11–12 (guests are nonetheless "camping" right next to The Well");[5] ¶ 38 (The Well "interferes with the public's right to use and quiet enjoyment of their property"). Regulations controlling what property owners can and cannot do with their properties are indeed "land use regulations," and their enforcement is thus covered by RLUIPA. *Martin*, 96 F. Supp. 3d at 1263–64.

In addition, the City's nuisance complaint invokes several of the same considerations as the CUP ordinance, further confirming that the nuisance complaint concerns a land use regulation. To obtain a CUP for a "homeless day shelter," the City may consider

> whether or not the applicant submitted an appropriate security plan for the operations of the facility [and] factors that may affect the general public health and welfare, including,. . . the effect the facility would have on schools, college campuses and churches in the area, the effect the facility would have on existing land uses in the area, [and] the character of the area and its suitability for the particular use sought.

Ordinance 1078, Brunswick City Code, §§ 13-655(4) and (6). Similarly, the City's nuisance action alleges (erroneously) that "[T]he Well does not maintain a safety or security plan," Nuisance Compl. ¶ 27, that The Well "is located adjacent to Safe Harbor Children's Center and only blocks away from City Hall, many churches, and Glynn Academy," *id*. ¶ 7, and that action "focuses" on "complaints by neighboring owners and businesses regarding conduct 'offensive to the senses' emanating from the Well." *See* Mot. at 10 (citing Nuisance Compl.). Clearly, the City is trying to achieve through the nuisance action what it could not accomplish through the CUP ordinance.

---

[5] Notably, in 2022, the City passed the Urban Camping and Improper Use of Public Spaces Ordinance, which makes camping on public property illegal and requires that camping on private property "must be in conformity with . . . the zoning and land use provisions of" the City's Code. *See* Brunswick City Code §§ 16-94–95.

Defendant's citation to nuisance caselaw is a red herring. All told, the City is using the nuisance action as a vehicle to regulate The Well's use of its property. The City cannot avoid compliance with RLUIPA by arguing that the nuisance action is not a land use regulation.

### III. The City's Efforts to Shut Down The Well Impose a Substantial Burden

Relying on its blanket assertion that its efforts to shut down The Well are outside of RLUIPA's coverage, the City argues that the only land use regulation at issue is the CUP procedure under Ordinance 1078, which it claims does not impose a substantial burden on The Well. Mot. at 12–13. But, as discussed above, the United States alleges that the totality of the City's efforts to permanently shut down The Well is the substantial burden. And as alleged in the Complaint, the City's efforts demonstrate that it will not permit The Well to operate "anywhere" in Brunswick, substantially burdening the religious exercise of The Well's staff and leadership. Compl. ¶¶ 50–64.

RLUIPA prohibits the enforcement of land use regulations that substantially burden religious exercise unless that action "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling government interest." 42 U.S.C. §§ 2000cc(a)(1), 2000cc–1(a); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F. 3d 1214, 1225 (11th Cir. 2004) (RLUIPA guides that a substantial burden "must be justified as the least restrictive means of furthering a compelling governmental interest"(citing §§ 2000cc(a)(1), 2000cc–1(a))); *see also Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 831 (11th Cir. 2020) (holding that even "modified behavior, if the result of government coercion or pressure, can be enough" to sustain a substantial burden claim).

Both parties seem to agree that The Well is not required to apply for a CUP under Ordinance 1078, the Homelessness Services Ordinance. *See* Mot. at 12. The City hides behind

this optional CUP procedure by claiming that a CUP would be sufficient, although not necessary, for The Well to continue operating, *id.*, yet continues to dangle the threat of wholly shutting down The Well through the nuisance action. To the extent that the City treats the CUP as a requirement for The Well to continue operating at its current location, it imposes a substantial burden.

As a legal nonconforming use, The Well is not required to submit to the City's CUP procedure. *See* Brunswick City Code, § 23-3-15 (defining lawful nonconforming uses); *see also BBC Land & Dev., Inc. v. Butts Cnty.*, 640 S.E.2d 33, 34–35 (Ga. 2007) ("Nonconforming uses are uses of structures which were existing prior to the enactment of an ordinance," which "come into being initially as legal uses, and become nonconforming because of a subsequent change of zoning.") (citing *Corey Outdoor Advertising v. Board of Zoning Adjustments of Atlanta,* 327 S.E.2d 178 (Ga. 1985)). The City cannot now arbitrarily require The Well to apply for a CUP. *See Gethsemani Baptist Church v. City of San Luis*, 2024 WL 4870509, at *5 (D. Ariz. Nov. 22, 2024) (concluding that church was not required to seek a CUP under current zoning ordinance because of its "plausible claim that it maintains the legal right to continue operating its ministry pursuant to its non-conforming use status"); *see also Thai Meditation*, 980 F.3d at 832 (holding that substantial burden analysis considers "whether the City's decisionmaking process . . . reflects any arbitrariness of the sort that might evince animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around"); *Fortress Bible Church*, 694 F.3d at 219 ("Our conclusion that the Church was substantially burdened is bolstered by the arbitrary, capricious, and discriminatory nature of the Town's actions, taken in bad faith.").

The City cites no case analogous to this one, where a religious organization's use of a property pre-existed a new land use regulation but the organization was nevertheless forced to comply with the new ordinance. Indeed, the sole case Defendant cites, *Midrash Sephardi*, is inapposite, as it did not concern a religious organization with a prior nonconforming use. *See* Mot. at 11–13. In that case, two synagogues sought a CUP for a new synagogue in their town's business district, where it was prohibited, and claimed it would be a substantial burden for congregants to have to walk further to a synagogue built in a zoning district where houses of worship were permitted. The Eleventh Circuit clarified that "a 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Midrash Sephardi,* 366 F. 3d at 1227. The court held that requiring the new synagogue to be located in a different district than the business district, thereby forcing congregants to walk a few additional blocks, did not amount to a substantial burden. *Id.* at 1228. Unlike in this case, the synagogues in *Midrash Sephardi* sought a CUP for a *new* location, whereas here, the City suggests The Well apply for a CUP for its original, existing location, a legal nonconforming use.

Defendant suggests that because the Eleventh Circuit found that walking further was not a substantial burden in *Midrash Sephardi*, neither is the CUP application. *See* Mot. at 12–13. In essence, the City attempts to distract from its RLUIPA violation by pointing to a zoning ordinance that does not mandatorily apply to The Well. The real substantial burden here is the City's efforts to permanently close The Well. And the City's actions indicate that it would never approve a CUP at The Well's original location. In fact, City officials—including the Mayor and City Manager—expressed unequivocally that The Well will not be permitted to operate

anywhere in Brunswick, particularly without renaming itself and firing its current pastor. Compl. ¶¶ 32–34, 51. The Well thus withdrew its application for a CUP at another Brunswick location, understanding that effort to be futile.

In addition, the City's attempts to shut down The Well are not the least restrictive means of addressing any compelling government interest in regulating alleged public nuisances. *See* 42 U.S.C. § 2000cc–1(a). This is particularly so given The Well's fruitful efforts to address the City's security concerns by, for example, developing security protocols in conjunction with the Brunswick Police Department, prohibiting overnight camping, and monitoring guests' whereabouts. The Well has implemented meaningful steps to address the City's concerns, which are achievable short of closing The Well's doors forever. *See* Compl. ¶¶ 25–38; *see also Midrash Sephardi*, 366 F. 3d at 1225.

## CONCLUSION

For the reasons stated above, the Court should deny the City's Motion to Dismiss.

| | |
|---|---|
| Dated: April 3, 2025 | Respectfully submitted, |

| | |
|---|---|
| TARA M. LYONS<br>Acting United States Attorney | MAC WARNER<br>Deputy Assistant Attorney General |
| | MICHAEL E. GATES<br>Deputy Assistant Attorney General |
| | CARRIE PAGNUCCO<br>Chief |
| | MICHAEL S. MAURER<br>Deputy Chief |
| */s/ Bradford C. Patrick*<br>BRADFORD C. PATRICK<br>Assistant United States Attorney<br>South Carolina Bar No. 102092<br>22 Barnard Street, Suite 300<br>Savannah, GA 31401<br>Phone: (912) 652-4422<br>Fax: (912) 652-4427<br>Bradford.Patrick@usdoj.gov | */s/ Ameya S. Ananth*<br>AMEYA S. ANANTH<br>NOAH D. SACKS<br>Trial Attorneys<br>U.S. Department of Justice<br>Civil Rights Division<br>Housing & Civil Enforcement Section<br>950 Pennsylvania Ave. NW – 4CON<br>Washington, DC 20530<br>Phone: (202) 514-4713<br>Fax: (202) 514-1116<br>Ameya.Ananth@usdoj.gov<br>Noah.Sacks@usdoj.gov |
| JENNIFER THOMPSON<br>Assistant United States Attorney<br>Alabama Bar No. 8400E77T<br>600 James Brown Blvd., Suite 200<br>Augusta, GA 30901<br>Phone: (912) 652-4422<br>Fax: (912) 652-4427<br>Jennifer.Stanley@usdoj.gov | |